IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| MICHAEL MAX MILLER,<br><br>   Petitioner,<br><br>vs.<br><br>LEROY KIRKEGARD; ATTORNEY GENERAL OF THE STATE OF MONTANA,<br><br>   Respondents. | Cause No. CV 13-13-GF-DWM-RKS<br><br><br>FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |

   Mr. Miller was charged by the State of Montana with deliberate homicide and convicted after a jury trial in 2007. On February 6, 2013, Michael Max Miller filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. Respondents ("the State") filed portions of the state court's record on July 2, 2013. Mr. Miller is a state prisoner proceeding pro se.

## I. Preliminary Screening

   Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts requires courts to examine the petition before ordering the respondent to file an answer or any other pleading. The petition must be summarily dismissed "[i]f it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." *Id.*

   A petitioner "who is able to state facts showing a real possibility of

1

constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolaus*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). Consideration under Rule 4 "may properly encompass any exhibits attached to the petition, including, but not limited to, transcripts, sentencing records, and copies of state court opinions. The judge may order any of these items for his consideration if they are not yet included with the petition." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases. "[I]t is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." *Id.*; *see also* 28 U.S.C. § 2243.

## II. Background

Mr. Miller challenges his conviction for deliberate homicide in violation of Mont. Code Ann. § 45-5-102(1)(a) (2005). He is currently serving a 100-year sentence at Montana State Prison. He will not be eligible for parole for the first 25 years of his sentence. Judgment at 2 (Doc. 14-12 at 156).

The Court has reviewed the trial record in detail but will not set out the testimony here. In sum, Mr. Miller's conviction arose from the disappearance of Lamar Windham, a longtime friend of Mr. Miller. On June 26, 2006, Mr. Miller, Mr. Windham, and one Christopher "Al" Johnson drove out to the Rainbow Dam overlook in the Giant Springs area outside Great Falls. Leaving Mr. Johnson in the

van in the parking lot, Mr. Miller and Mr. Windham, who had been drinking, went down a steep, rocky trail. When Mr. Miller returned to the van, Mr. Windham was not with him. Mr. Miller and Mr. Johnson returned to Great Falls from the overlook without Mr. Windham. Mr. Miller took no action to find Mr. Windham. (Neither did Mr. Johnson, but he only met Mr. Windham the day before the visit to the overlook.) Several witnesses testified at trial that Mr. Miller's statements and behavior concerning Mr. Windham's disappearance ranged from callous to deliberately misleading to incriminating. But at least some of those witnesses' own statements were shown to be inconsistent with their prior statements or inconsistent with the accounts of other witnesses. Weeks after Mr. Windham's disappearance, his body was found at the foot of a cliff at the overlook. He had suffered multiple blunt-force blows. Forensic pathologists were unable to determine whether the death occurred by homicide, suicide, or accident.

The jury returned a guilty verdict on November 9, 2007. *See* 4 Trial Tr. at 973:15-977:11; 5 Trial Tr. at 980:1-981:5. Mr. Miller appealed, represented by new counsel. He challenged the denial of his motions to dismiss based on speedy trial and to compel production of Mr. Johnson's mental health records, a jury instruction on witness credibility, and the prosecutors' remarks in closing argument regarding witness credibility and Mr. Miller's "silence" when Mr. Windham's family asked him where Mr. Windham was. On September 23, 2009, the Montana

Supreme Court rejected Mr. Miller's claims and affirmed his conviction. Order at 13 ¶ 33, *State v. Miller*, No. DA 08-0091, 2009 MT 314N (Mont. Sept. 23, 2009) (unpublished).[1] Mr. Miller's conviction became final ninety days later, on December 22, 2009. *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012).

On January 14, 2011, Mr. Miller, acting pro se, filed a petition for postconviction relief in the trial court. Case Register (Doc. 14-15) at 1 Entry 2. The petition was dismissed on August 12, 2011. Mr. Miller appealed. On June 19, 2012, the Montana Supreme Court affirmed the trial court's denial of postconviction relief. *Miller v. State*, 280 P.3d 272, 282 ¶ 37 (Mont. 2012).

Mr. Miller signed his federal habeas petition and deposited it in the prison mail system on February 5, 2013. Pet. (Doc. 1) at 8, Pet'r Decl. ¶ C; *Houston v. Lack*, 487 U.S. 266, 270-71 (1988) (establishing prison mailbox rule).

### III. Procedural Posture of the Case

Mr. Miller's case is in the Rule 4 prescreening stage. Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts requires courts to examine the petition before ordering the respondent to file an answer or any other pleading. The screening court's task is to determine whether further proceedings are warranted, such as the ordering of a responsive pleading,

---

[1] This opinion is available at http://supremecourtdocket.mt.gov.

appointment of counsel, or an evidentiary hearing.

A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolaus*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). But the petition must be summarily dismissed "[i]f it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." *Id.* Rule 4 screening "may properly encompass any exhibits attached to the petition, including, but not limited to, transcripts, sentencing records, and copies of state court opinions." "The judge may order any of these items for his consideration if they are not yet included with the petition." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases; *see also* Order to State to File Documents (Doc. 10). "[I]t is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." *Id.*; *see also* 28 U.S.C. § 2243.

As to the claims described below in Parts IV.A and IV.B.1, Mr. Miller fails to show a real possibility of constitutional error. The following claims should be denied.

## IV. Claims and Analysis

### A. Claims Decided on the Merits by the Montana Supreme Court

The Montana Supreme Court adjudicated the merits of some of the claims Mr. Miller presents in this Court. Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), where a state court has denied relief on the merits, a state prisoner may obtain federal habeas relief only if the state court's denial of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court's denial was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

These standards impose heavy burdens on state habeas petitioners. "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 786-87 (2011).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011).

Under the § 2254(d) standards, the following claims lack merit.

## 1. Speedy Trial

"[T]he right to a speedy trial is a more vague concept than other procedural rights. It is . . . impossible to determine with precision when the right has been denied." *Barker v. Wingo*, 407 U.S. 514, 521 (1972). Consequently, there is no federal rule setting forth a specific period of time within which a trial must commence. Courts consider the conduct of both the prosecution and the defense and employ a balancing test weighing the length of the delay between charge or arrest and trial, the reason for the delay, whether the defendant asserted his right to a speedy trial, and whether he was prejudiced as a result of the delay. *Id.* at 530.

Mr. Miller disagrees with the trial court's characterization of a three-month period of delay as institutional delay as well as its weighing that delay "moderately against the State." *See* Order at 7 ¶ 16, *Miller*, No. DA 08-0091; Hr'g Tr. at 165:25-166:24 (Doc. 14-12 at 122-23); Appellant Br. at 18-41 (Doc. 14-12 at 27-50); Pet. at G1 (Doc. 1-4 at 18); Final Add'l Claims (Doc. 20) at 3-7. Other than his disagreement, Mr. Miller does not identify any flaw in the trial court's factual findings.[2] Thus, 28 U.S.C. § 2254(e)(1) applies, and the trial court's findings are presumed correct. *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2003).

---

[2] To the extent it may be unreasonable to postpone a criminal trial because the prosecutor is a member of the State Legislature and must attend the session, the trial court found this reason "secondary" and decided "the primary root cause of that delay was the backlog in the Montana Crime Lab, due to staffing and/or resource deficiencies." *See* Hr'g Tr. at 163:19-164:21 (Doc. 14-12 at 120-21).

A reasonable court could find that an understaffed crime lab is equivalent to a crowded trial docket – acceptable, within limits, as institutional delay. A reasonable court could also find the State's delay in sending a pair of shoes to the crime lab occurred early in the case and did not materially extend the overall delay. Finally, a reasonable court could also find, despite intensification of the presumption of prejudice to the defense over time, *see Doggett v. United States*, 505 U.S. 647, 652 (1992), Mr. Miller's legitimate need to obtain independent expert analysis of the body justified the delay occurring after April 2007. *See* Hr'g Trs. (Docs. 14-3, 14-4, 14-5). The standards of § 2254(d) are not met. *See* Order at 6-7 ¶¶ 14-17, *Miller*, No. DA 08-0091. This claim should be denied.

## 2. Jury Instruction on Witness Credibility

Mr. Miller contends the trial court erred in instructing the jury that it could consider, among other things, "[w]hether the witnesses have an interest in the outcome of the case or any motive, bias, or prejudice." He asserts that the instruction adversely affected his choice as to testifying. Pet. at F2 (Doc. 1-4 at 15) (referring to Mont. Crim. Instr. No. 1-003 (Doc. 14-12 at 152)). A reasonable court could find such an instruction appropriate. *See, e.g.*, 9th Cir. Jury Instr. (Crim.) No. 1.8 (2003) (instructing jury it may consider, among other things, "the witness's interest in the outcome of the case and any bias or prejudice"); 9th Cir. Jury Instr. (Crim.) No. 1.7 (2010) (same). The standards of § 2254(d) are not met. *See* Order

at 7-8 ¶¶ 18-21, *Miller*, No. DA 08-0091. This claim should be denied.

### 3. Motion for Mental Health Records

The trial court denied Mr. Miller's motion to compel the State to produce Mr. Johnson's mental health records. Mr. Miller alleges that his inability to obtain access to this evidence violated his right to due process because it prevented him from questioning Johnson's credibility. Pet. at F3 (Doc. 1-4 at 16).

A State may not prohibit a defendant from "otherwise appropriate cross-examination" designed to "expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986); *see also Holmes v. South Carolina*, 547 U.S. 319, 324-25 (2006). Assuming, solely for the sake of argument, mental health records might indicate some prospect of undermining a witness's ability to perceive and remember facts, the jury had far more direct evidence on the point. It knew Mr. Johnson was taking Zyprexa at the time of the incident, 2 Trial Tr. at 513:13-515:5. The jury knew Mr. Johnson was using alcohol in combination with the Zyprexa, contrary to medical advice. *Id.* at 530:19-532:4.

Further, the jury knew of multiple issues with Johnson's trial testimony. Mr. Johnson described Mr. Windham as shirtless and wearing cut-off blue jeans and white tennis shoes, 2 Trial Tr. at 526:21-528:4, but Mr. Windham's body was found clothed in black full-length polyester-type pants with no shirt and no shoes,

3 Trial Tr. at 584:1-15, 585:11-12. A pair of Mr. Windham's boots were found in the van, 3 Trial Tr. at 623:20-624:7, but no white tennis shoes were found.  Mr. Johnson testified Mr. Miller returned to the van without Mr. Windham 30 to 45 minutes after they had left the van together, 2 Trial Tr. at 498:7-9, 498:21-23, but Mr. Johnson told Detective Phillips that Mr. Miller and Mr. Windham were gone for about an hour and 45 minutes and Mr. Johnson slept during that time, 2 Trial Tr. at 523:22-524:14, 3 Trial Tr. at 742:6-8.  Mr. Johnson testified he did not think the keys were in the ignition when Mr. Miller and Mr. Windham left the van, 2 Trial Tr. at 502:20-503:3, 524:15-525:16, but he told Detective Phillips the key was in the ignition, 3 Trial Tr. at 741:18-742:5.  Mr. Johnson testified he and Mr. Miller were at Mr. Dogtakinggun's house the evening after the trip to the overlook, and when Mr. Dogtakinggun asked Mr. Miller where Mr. Windham was, Mr. Miller repeatedly said he did not want to talk about it and then left when Mr. Dogtakinggun became angry. 2 Trial Tr. at 504:16-506:22. But Mr. Dogtakinggun testified that he did not talk to Miller about Windham until weeks later, after police identified Mr. Dogtakinggun as a person of interest, picked him up, and interrogated him about Windham's disappearance. *Id.* at 541:21-546:14.  Mr. Johnson testified at trial that he asked Miller the next day whether Mr. Windham got back, and Mr. Miller responded that Mr. Windham "came back" and "it was okay" for Mr. Miller to use the van. 2 Trial Tr. at 507:4-508:25. But before trial,

Mr. Johnson had said in one interview that Mr. Miller said Mr. Windham had not come home yet, 4 Trial Tr. at 900:18-25, and in another pretrial interview, Mr. Johnson did not say that he or Mr. Miller said anything at all about Mr. Windham having come home, *id.* at 915:8-10. Mr. Johnson testified that, when Mr. Windham's family took him and Miller to the overlook to search for Mr. Windham, Mr. Johnson told the family Mr. Windham went over the embankment and down the trail, and Mr. Miller pointed in another direction. But Mr. Johnson also testified that he searched, with Eva, in the direction indicated by Mr. Miller. 2 Trial Tr. at 511:15-512:6, 528:18-529:8; *see also id.* at 401:15-402:6. When Mr. Johnson went into the police station with Mr. Windham's family to make a report, he reported that he, Mr. Miller, and Mr. Windham parked at the upper overlook, the Lewis and Clark overlook, rather than the lower Rainbow Dam overlook. 2 Trial Tr. at 528:12-17, 3 Trial Tr. at 733:13-735:3.

Given these contradictions, there is no reason to think Mr. Miller's lack of access to Mr. Johnson's mental health records prevented him from demonstrating "facts from which jurors could appropriately draw inferences relating to the reliability of the witness." *Van Arsdall*, 475 U.S. at 680. The request was tantamount to requesting the medical records of a witness who wears contact lenses. There was simply no reason to think such a highly intrusive inquiry would be justified by the quality or extent of probative impeachment evidence it would

produce. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment . . . or interrogation that is repetitive or only marginally relevant." *Id.* at 679. Under the circumstances here, there was no error in denying Mr. Miller access to Mr. Johnson's mental health records. The standards of § 2254(d) are not met. *See* Order at 8-10 ¶¶ 22-26, *Miller*, No. DA 08-0091. This claim should be denied.

### 4. Ineffective Assistance of Trial Counsel

In his postconviction appeal, Mr. Miller alleged that appellate counsel was ineffective for failing to present, on direct review, record-based claims of ineffective assistance of trial counsel. *See Miller*, 280 P.3d at 277 ¶ 11. The Montana Supreme Court reviewed the performance of Mr. Miller's appellate counsel by considering whether trial counsel was ineffective. Thus, both Mr. Miller's claims of ineffective assistance of *trial* counsel and his claims of ineffective assistance of *appellate* counsel were in fact decided on the merits by the Montana Supreme Court. The standards of § 2254(d) apply to both sets of claims.

To show a violation of the right to the effective assistance of counsel, Mr. Miller must show both that counsel's performance fell below an objective standard of reasonableness and "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). These standards

apply equally to claims of ineffective assistance of trial and of appellate counsel.

*Smith v. Robbins*, 528 U.S. 259, 285 (2000).

Further, where, as here, the state court has already decided a claim of

ineffective assistance of counsel on the merits, the petitioner's task is "all the more

difficult." *Richter*, 131 S. Ct. at 788. "The standards created by *Strickland* and by §

2254(d) are both 'highly deferential,' and when the two apply in tandem, review is

'doubly' so." *Id.* (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009))

(internal quotation marks and citations omitted). "[T]he question is not whether

counsel's actions were reasonable. The question is whether there is any reasonable

argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### a. Power Point Presentations

At the close of trial, defense counsel moved to have the State's Power Point

presentation, used in opening statement and closing argument, entered into the

record of the case. The motion was denied because the defense did not object to the

State's presentation.

Mr. Miller contends that counsel should have objected to the State's Power

Point presentation. Pet. at B10 (Doc. 1-3 at 11). He does not claim counsel had any

legal basis for objecting. Nor did he make any showing of prejudice either from the

Power Point presentation or from its omission from the record. The standards of §

2254(d) are not met. *See Miller*, 280 P.3d at 278 ¶¶ 16-17. This claim should be denied.

### b. Failure to Impeach Johnson and Little Young Man

Mr. Miller complains that counsel failed to impeach these witnesses. Pet. at B5-B6 (Doc. 1-3 at 6-7). Counsel did, in fact, impeach these witnesses. Mr. Miller complains that counsel did not impeach them well enough to obtain an acquittal. But Mr. Miller has identified no available but unused legal or factual basis for further impeachment of either witness. In addition, it is impossible to show a reasonable probability that the result would have been different if counsel had impeached more or differently. The standards of § 2254(d) are not met. *See Miller*, 280 P.3d at 278-81 ¶¶ 18-33. This claim should be denied.

### c. Failure to Object During Argument to the Court

Mr. Miller contends, Pet. at B5 (Doc. 1-3 at 6), that counsel should have objected to the prosecutor's statement, in argument on the defense motion to dismiss for insufficient evidence, *see* Mont. Code Ann. § 46-16-403, that there was physical evidence of a crime. The trial judge heard the evidence and knew the manner of Mr. Windham's death was undetermined. Even if an objection had been made and sustained, a reasonable court could fail to find any reasonable probability the trial court's analysis would have been different. The standards of § 2254(d) are not met. *See Miller*, 280 P.3d at 281-82 ¶¶ 34-36. This claim should be denied.

### 5. Prosecutorial Misconduct

To constitute a due process violation, prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)).

### a. Comment on Witness Credibility

A prosecutor improperly vouches for a witness's credibility when he "place[s] the prestige of the government behind the witness" or "indicate[s] that information not presented to the jury supports the witness's testimony." *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980). *See, e.g.*, *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) (improper for prosecutor to say that, if the prosecution witnesses are not believed, "what you need to believe, ladies and gentlemen, [is] in this little case that the reputation of the department of justice would be put on the line to solicit false testimony just to prove up a case against these two defendants."); *United States v. Kerr*, 981 F.2d 1050, 1052-53 (9th Cir. 1992) (improper for prosecutor to ask "Were [the prosecution witnesses] hoodwinking [DEA Agent] Zarndt when I sat there on part of the interviews, were they hoodwinking me, were they hoodwinking the Court, when the Court accepts their plea agreements when they agreed to cooperate?").

Despite Mr. Miller's claims, Pet. at A4 (Doc. 1-2 at 33); *id.* at D7-D8 (Doc.

1-3 at 50-51), these objectionable comments are qualitatively different from the prosecutors' arguments in Mr. Miller's case. Based on the evidence and reasonable inferences drawn from it, the State encouraged the jury to find the prosecution witnesses were credible and Mr. Miller's statements were not. *See* 5 Trial Tr. at 930:5-938:20, 966:16-969:9. The prosecutors engaged in fair argument about the witnesses' credibility. The standards of § 2254(d) are not met. *See* Order at 10-12 ¶¶ 27-32, *Miller*, No. DA 08-0091; *Miller*, 280 P.3d at 278 ¶ 15. This claim should be denied.

### b. Comment on Mr. Miller's "Silence"

Mr. Miller also alleges that the prosecution commented on his decision to remain silent. Pet. at A4-A6, A20-A21, A23, A27 (Doc. 1-2 at 33-35, 49-50, 52, 56). It did not. It commented, extensively and to considerable effect, on Mr. Miller's lack of interest in finding Mr. Windham, including his failure to go into the police station to talk to the authorities with Mr. Johnson and Mr. Windham's family. Based on Mr. Miller's statement that Mr. Windham had "run off" and failed to reappear, as well as his failure to alert the authorities to Windham's disappearance, the prosecutors also legitimately urged the jury to find that Mr. Miller's decision not to make a report evidenced a guilty conscience. Further, as Mr. Miller voluntarily gave a statement to the police, the prosecution was free to comment on that statement and to encourage the jury to draw reasonable inferences

from it. The prosecution did not so much as hint at Mr. Miller's choice not to testify at trial. The standards of § 2254(d) are not met. *See* Order at 10-12 ¶¶ 27-32, *Miller*, No. DA 08-0091. This claim should be denied.

### c. Associated Ineffective Assistance Claim

Mr. Miller claims that counsel were ineffective for failing to object to the prosecutors' arguments concerning witness credibility and Mr. Miller's "silence." Pet. at B1-B2 (Doc. 1-3 at 2-3). Because it was reasonable for the Montana Supreme Court to find no prosecutorial misconduct in these instances, it was also reasonable for that court to find that defense counsel was not ineffective for failing to object. *Miller*, 280 P.3d at 277 ¶ 11. The standards of § 2254(d) are not met. This claim should be denied.

### 6. Ineffective Assistance of Appellate Counsel

Because it was reasonable for the Montana Supreme Court to conclude that the foregoing claims of prosecutorial misconduct and ineffective assistance of trial counsel lacked merit, *see* Parts IV.A.4(a) and IV.A.5; Pet. at C1-C3 (Doc. 1-3 at 41-43), it was also reasonable for the Montana Supreme Court to conclude that appellate counsel's failure to raise them was not ineffective. *Miller*, 280 P.3d at 277 ¶ 11. The standards of § 2254(d) are not met. This claim should be denied.

### B. Claims Defaulted in State Court

Some of Mr. Miller's claims were not raised at all in state court. They are defaulted because it is too late for Mr. Miller to raise them now. *See* Mont. Code Ann. § 46-21-102(1)(b); *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Smith v. Baldwin*, 510 F.3d 1127, 1137-39 (9th Cir. 2007) (en banc). Although the following claims are procedurally defaulted, procedural issues need not be further considered. These claims are clearly lacking in merit.

### 1. Presentation of False Testimony and Evidence

A prosecutor who presents testimony or evidence he knows to be false, or who allows it to pass uncorrected when it appears, violates federal due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc).

Mr. Miller asserts that the prosecution knowingly presented false testimony because it knew its witnesses gave statements that conflicted with other witnesses' statements and knew its witnesses' testimony or statements were inconsistent with their own previous statements. Pet. at A5-A12, A17-A20, A22, A29-A30 (Doc. 1-2 at 34-41, 46-49, 51, 58-59). The discrepancies between Johnson's trial testimony and his pretrial statements to law enforcement and defense investigators, for example, *see supra* at 9-11, were indeed numerous, and other witnesses' testimony featured similar discrepancies, *compare, e.g.*, 2 Trial Tr. at 403:11-15, 415:11-416:3, 425:6-429:12 *with* 4 Trial Tr. at 901:4-22.

But it is common for a witness's pretrial statements to vary from his or her trial testimony. Factual discrepancies arise equally often between various witnesses' versions of what happened. There is no reason to believe the State knew which statements were true and complete in every detail and which were mistaken or incomplete or false. Each of the inconsistencies Mr. Miller identifies was presented to the jury at trial. The jury's job was to decide which testimony mattered and could be believed beyond a reasonable doubt.

Mr. Miller also claims the police planted a beer can a little way up the trail from the place where Mr. Windham must have fallen. The beer can had traces of DNA consistent with Mr. Miller's. 3 Trial Tr. at 615:4-23, 654:19-655:19, 674-676:19. Mr. Miller believes the can must have been planted there because Mr. Johnson testified neither Mr. Miller nor Mr. Windham took any beer when the two of them headed down the trail. Pet. at A26 (Doc. 1-2 at 55). Mr. Miller does not explain why Mr. Johnson, whose testimony he questions in so many other respects, must necessarily be right about the beer can, much less why the State was required to believe he was right.[3]

There is no evidence whatever of a *Napue* violation. This claim should be denied.

---

[3] There was testimony indicating the beer can could have wound up where it was found by means other than Mr. Miller's transporting it there. The crime scene was not secured until three days after Windham's body was found. 3 Trial Tr. at 735:24-736:12.

## 2. Jury Unanimity

Mr. Miller asserts that the jury did not agree on the manner in which he caused Mr. Windham's death. Pet. at A10, A12-A14, A30 (Doc. 1-2 at 39, 41-43, 59).[4] As the jury was not asked to agree, it is impossible to know whether all agreed or not. Assuming, however, the jury was not unanimous on the issue,[5] Mr. Miller's claim still lacks merit.

To convict a defendant of deliberate homicide, the jury must find, beyond a reasonable doubt, that the defendant purposely or knowingly caused the death of another person. Mont. Code Ann. § 45-5-102(1)(a). How the death was caused is not an element of the crime. It need not be proved beyond a reasonable doubt, and all jurors need not agree on it. *See* Mont. Code Ann. § 45-2-201(1), (2); *see also, e.g.*, *State v. Riley*, 649 P.2d 1273, 1278-79 (Mont. 1982).

Mr. Miller relies on *State v. Weaver*, 964 P.2d 713 (Mont. 1998), in which

---

[4]  Mr. Miller asserts that a poll of the jurors, conducted after trial, showed that at least one of them and as many as six would have voted to convict Mr. Miller of negligent homicide rather than deliberate homicide if that option had been available. Pet. at A12-A13 (Doc. 1-2 at 41-42). Based on this poll, he infers that the jury's verdict on deliberate homicide was not unanimous. Again, the conclusion does not follow from the premise; other reasons, such as leniency, may explain a lesser verdict than is warranted by the evidence presented. *Dunn v. United States*, 284 U.S. 390, 393-94 (1932). But, regardless, a post-trial survey of jurors cannot impeach a verdict. Fed. R. Evid. 606(b)(1).

[5]  The Constitution does not require jury unanimity. *See, e.g.*, *Apodaca v. Oregon*, 406 U.S. 404, 406 (1972) (plurality op.); *Johnson v. Louisiana*, 406 U.S. 366, 373-74 (1972) (Powell, J., concurring). State law does, *see* Mont. Const. Art. II, § 26; Mont. Code Ann. § 46-16-603(1), so the Court will presume that Mr. Miller could fairly allege a violation of his federal right to due process if jury unanimity was not required in his case. *Cf. Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (finding federal due process violation where defendant had "a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the

the Montana Supreme Court held the State violated the defendant's right to a unanimous verdict. There, the State alleged the defendant committed sexual assault against one victim within a time span of five months and committed sexual assault against another victim within a time span of five years. *Id.* at 716 ¶¶ 9, 13. The State then introduced evidence that, if believed, would have established multiple occasions of sexual assault against each victim within those time periods. *Id.* at 717 ¶ 17. In those circumstances, the defendant could have been convicted as to victim J.M. if, for example, five jurors found he sexually assaulted J.M. on one occasion but not on a second occasion, and seven jurors were not convinced beyond a reasonable doubt that he sexually assaulted J.M. on the first occasion but found he did so on the second occasion. *See id.* at 719-21 ¶¶ 32-38. Thus, the manner in which the offense was charged allowed the defendant to be convicted even if the State did not persuade all jurors, beyond a reasonable doubt, as to any given instance of sexual assault.

Here, by contrast, the State alleged one discrete incident, occurring on or about June 26, 2006, at or near the Missouri River Rainbow Dam Overlook. *See, e.g.*, 1 Trial Tr. at 18:6-15. There was no realistic possibility that some jurors might have found that Mr. Miller killed Mr. Windham in one incident and other jurors that he killed Mr. Windham in a separate incident on a separate occasion. Nor did

exercise of its statutory discretion" under state law).

the State charge multiple alternative means of committing the crime under a "divisible" statute, *cf. Descamps v. United States*, __ U.S. __, 133 S. Ct. 2276, 2281, 2288-89 (2013), as it did in *State v. Weldy*, 902 P.2d 1, 7 (Mont. 1995), *discussed in Weaver*, 964 P.2d at 720-21 ¶¶ 37-38. *Weaver* and *Weldy* do not apply to Mr. Miller's case.

This claim should be denied.

### 3. Lack of Notice

Mr. Miller contends the State's shifting theories of how Windham died – by strangulation, by other assault, or by being pushed off the cliff – prevented him from mounting an adequate defense and so violated his right to due process. Pet. at A13 (Doc. 1-2 at 42); *id.* at D1 (Doc. 1-3 at 44). The Sixth Amendment entitles a defendant to notice adequate to enable him to prepare a defense, *e.g.*, *Application of Gault*, 387 U.S. 1, 33 & n.53 (1967); *Cole v. Arkansas*, 333 U.S. 196, 201 (1948), and a change in the State's theory between charge and trial or appeal can unconstitutionally impede a defendant's defense, *Cole*, 333 U.S. at 199-201. In *State v. Spotted Eagle*, 243 P.3d 402 (Mont. 2010), for instance, the State charged assault causing bodily injury but, after the close of all the evidence, it obtained a jury instruction allowing consideration of whether the defendant instead caused reasonable apprehension of bodily injury. Thus, the defendant had no opportunity to prepare a defense or cross-examine witnesses. *Id.* at 404 ¶ 11. The Montana

Supreme Court reversed the conviction. *Id.* ¶ 14.

Here, however, the State admitted from the outset that it could not prove exactly how Mr. Miller caused Mr. Windham's death. Mr. Miller had and used every opportunity to examine witnesses to meet the State's theory that he caused Windham's death and to support his claim that he did not. Mr. Miller does not allege, much less show, a discrepancy between the charge and the elements proved at trial. This claim should be denied.

### 4. Lesser Included Offense

With very liberal construction, *cf. Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), Mr. Miller might be understood to allege that counsel was ineffective for failing to request an instruction on negligent homicide as a lesser included offense. *See* Pet. at A12 paras. 4, 5 (Doc. 1-2 at 41). It is possible counsel did so, but the instruction was refused. *See* 4 Trial Tr. at 921:18-923:1. Regardless, the issue can be addressed and disposed of, whether counsel requested the instruction or not.

Negligent homicide involves "a lesser kind of culpability" than deliberate homicide, Mont. Code Ann. § 46-1-202(9)(c), and so likely is a lesser included offense of deliberate homicide, although it does not appear there is a Montana case on point.

But Mr. Miller's chosen defense was that he did not play any role in *causing*

23

Windham's death. *See* 2 Trial Tr. at 378:3-21; 4 Trial Tr. at 948:22-949:5. That defense is the one Mr. Miller continues to propound. *E.g.*, Pet. at A16 (Doc. 1-2 at 45); Final Add'l Claims (Doc. 20) at 2. Because causation is an element shared by deliberate homicide and negligent homicide, a jury instruction on negligent homicide would have been inconsistent with Mr. Miller's own theory of the case. Further, counsel's strategy of denying causation was the only strategy consistent with *all* of Mr. Miller's statements before trial. Even assuming counsel might reasonably have pursued alternative defenses as well, including negligent homicide, Mr. Miller's continuing insistence that he had nothing to do with Windham's death puts counsels' strategy well within the wide range of reasonable professional assistance.

To the extent Mr. Miller claims trial counsel requested an instruction on negligent homicide but the trial court erred in refusing it, the claim fails. "[A] lesser included offense instruction is not supported by the evidence where the defendant's evidence or theory, if believed, would require an acquittal." *State v. Martinez*, 968 P.2d 705, 707-08 ¶¶ 9-15 (Mont. 1998); *State v. Jay*, 298 P.3d 396, 407 ¶ 44 (Mont. 2013). No evidence at trial tended to show that Mr. Miller caused Mr. Windham's death but did so negligently rather than purposely or knowingly. Consequently, even if counsel requested the instruction, the trial court did not err in refusing it.

This claim, to whatever extent Mr. Miller makes it, should be denied.

### 5. New Alternative Explanations

Mr. Miller emphasizes various facts that he believes show the jury was mistaken in convicting him. He contends that the death was an accident, Pet. at A16 (Doc. 1-2 at 45), and Mr. Windham was intoxicated by alcohol and was taking oxycontin, Pet. at A21 (Doc. 1-2 at 50). These matters were presented at trial. The former was subsumed in Mr. Miller's theory that he did not cause Windham's death. The latter was aired at trial sufficiently to support the accident theory. 2 Trial Tr. at 408:12-21 (E. Little Young Man), 481:23-484:12, 485:14-16, 488:4-493:1, 497:7-15 (Johnson), 556:22-557:8 (Williams); 4 Trial Tr. at 905:4-14 (Kohm). In light of the jury's verdict, these explanations require no further discussion.

Mr. Miller also offers responses, not advanced at trial, to the reasonable inferences the prosecution asked the jury to draw from the evidence. He asserts he was too intoxicated to fight with Mr. Windham, Pet. at A14 (Doc. 1-2 at 43); that he was not arguing with Mr. Windham, and Mr. Johnson could not have seen him doing so because the van was parked facing in the opposite direction, *id.* at A15-A16 (Doc. 1-2 at 44-45); and that Mr. Miller asked an acquaintance for a ride so the van would be available for Mr. Windham to use on his return from wherever he went, Pet. at A21 (Doc. 1-2 at 50). And he asserts facts not in evidence at trial,

viz., that Mr. Windham and Mr. Johnson (but not Mr. Miller) ingested methamphetamine on the day Mr. Windham disappeared, Miller Aff. at 1 ¶ 2 (Doc. 1-8 at 1), as well as on previous occasions, Milliron Aff. at 1 ¶¶ 1-2 (Doc. 1-8 at 2); and that, after Mr. Miller returned to the van without Mr. Windham and looked around for him, he saw Mr. Windham "walking out into the riverbed and [he] started climbing this small waterfall ledge," Pet. Letter (Doc. 1-7) at 2; *see also* Final Add'l Claims (Doc. 20) at 2. But habeas is not an opportunity to re-try the case. Nor is a defendant entitled to an acquittal merely because he can proffer a plausible counter-inference for each inference suggested by the prosecution. Mr. Miller does not connect the foregoing allegations with a constitutional violation, which is what he must show in order to proceed in habeas. Mr. Miller's counter-inferences need not be further addressed. 28 U.S.C. § 2254(a).

Mr. Miller also alleges that Mary Griffin told him she saw Mr. Windham in Great Falls on June 30, 2006, four days after his outing at Giant Springs with Mr. Miller. He objects to the prosecution's failure to advise the jury of Ms. Griffin's remark. Pet. at A21 (Doc. 1-2 at 50); *see also* Pet. Letter (Doc. 1-7) at 2-3. The Constitution does not require the State to present any particular evidence to the jury.

Finally, Mr. Miller alleges that the prosecutor, judge, and defense counsel conspired against him. Pet. "Conspiracy Theory" (Doc. 1-4 at 23). This conclusion

follows from the premise – yet to be established – that Mr. Miller was wrongfully convicted.

None of these allegations need be further addressed.

### 6. Juror Notes

Mr. Miller complains that the jurors were not permitted to take notes during the testimony. Pet. at A16 (Doc. 1-2 at 45); *id.* at E3 (Doc. 1-4 at 11); *id.* at F1 (Doc. 1-4 at 14). The Constitution does not require trial judges to allow jurors to take notes. *See, e.g.*, *United States v. Scott*, 642 F.3d 791, 797 (9th Cir. 2011); *United States v. Baker*, 10 F.3d 1374, 1386, 1403 (9th Cir. 1993) (finding no abuse of discretion where trial judge did not allow jurors to take notes in 16-month trial). This claim should be denied.

### 7. Leading Questions

Mr. Miller points out that the prosecution asked several leading questions of one witness, Eva Little Young Man, and defense counsel did not object. Pet. at A17 (Doc. 1-2 at 46). The prosecutor's questions occasionally contained the answers he wanted to hear. But counsel did object to the only instance that could have proved prejudicial, 2 Trial Tr. at 395:11-396:8, 3 Trial Tr. at 623:8-18 (showing that Eva found key in van and took it to police station), and in light of all the evidence presented at trial, any prejudice was insignificant. In sum, whether prejudice is measured by the standard of *Strickland* or of *Brecht v. Abrahamson*,

507 U.S. 619, 631 (1993) ("substantial and injurious effect or influence in determining the jury's verdict."), Mr. Miller cannot show it. This claim should be denied.

### 8. Securing the Crime Scene

Mr. Miller criticizes the defense for failing to secure the crime scene. He also contends that counsel should have objected to law enforcement officers' failure to secure the crime scene sooner and better than they did. Pet. at B7 (Doc. 1-3 at 8). The jury knew about the issue and its potential consequences. 3 Trial Tr. at 735:24-736:12. This claim should be denied.

### 9. Presentence Interview

Mr. Miller claims that his counsel were not present at his presentence interview. Pet. at B9 (Doc. 1-3 at 10). He does not challenge his sentence[6] or identify any prejudice from counsel's absence. This claim should be denied.

### 10. Questioning of Dr. Kemp

Mr. Miller alleges the trial court and the prosecutor violated his right to due process by the manner in which they asked questions of the State's pathologist, Dr. Kemp. Mr. Miller portrays the testimony at trial as if Dr. Kemp said that Mr. Windham's injuries were all the result of blunt-force trauma caused by falling from

---

[6] Mr. Miller states that his trial ended on November 9, 2007, and he was sentenced on January 10, 2008, "475 days later." Ineffective Appellate Counsel Issues (Doc. 15-1) at 2. This is the closest he comes to a sentencing claim. It is specious.

the cliff, but the prosecutor and trial court then forced him to suggest that was not the case. Pet. at D10 (Doc. 1-3 at 54). Dr. Kemp's testimony plainly was not coerced. This claim should be denied.

### 11. Jury Selection

Mr. Miller contends his jury was not impartial. Pet. at E1-E4 (Doc. 1-4 at 9-12). Mr. Miller begins with his belief that the verdict was wrong and unfair and concludes that the jury must have been biased. The conclusion does not follow from the flawed premise. The only juror Mr. Miller identifies as potentially biased – a man whose grandson had been shot and killed – gave ample indication that he would be a fair and impartial juror. *See* 1 Trial Tr. at 303:1-304:14, 315:24-317:6, 317:25-319:1. The procedures used for voir dire and jury selection were unremarkable. This claim should be denied.

### 12. Prosecution's Opening Statement

Mr. Miller claims the prosecutor implied, during opening statement, the existence of non-existent evidence. Pet. at A15 (Doc. 1-2 at 44). He did not. Forensic evidence was indeed presented at trial. The opening statement was not objectionable, much less unconstitutional. This claim should be denied.

### 13. Dr. O'Donnell's Testimony on Credibility

Mr. Miller asserts that counsel were ineffective because they failed to call James O'Donnell, an expert on the effects of Seroquel, Zyprexa, and alcohol, on

perception and memory. Mr. Miller also argues that Dr. O'Donnell should have been permitted to testify about the impact of such effects on Johnson's credibility.

The first part of this claim, regarding Dr. O'Donnell's pharmacological testimony, is addressed separately. As to Dr. O'Donnell's testimony on Johnson's credibility, however, *see* Pet. at D8-D9 (Doc. 1-3 at 51-52), lay and expert witnesses alike are generally prohibited in Montana from offering opinions about other witnesses' credibility.[7] The federal courts, too, generally proscribe any witness's expression of an opinion on the credibility of another witness's trial testimony. *See, e.g.*, Fed. R. Evid. 405(a), 608(a), 701; *United States v. Sine*, 493 F.3d 1021, 1034-35 (9th Cir. 2007) (holding admission in criminal trial of evidence of civil trial judge's opinion of witness's credibility was erroneous and prejudicial). There is nothing arbitrary or disproportionate, *see, e.g.*, *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 58 (1987)), about a rule that simply follows the long tradition of entrusting credibility determinations to the jury. This claim should be denied.

### 14. New Evidence

Mr. Miller contends he has newly discovered evidence of his innocence. He refers to a September 2012 letter from a forensic anthropologist, Dr. Stephen Syme. Attached to the letter is an abstract regarding a study that strengthens the

---

[7] The strictly delimited exceptions did not apply in Mr. Miller's case. *See* Mont. R. Evid.

evidentiary connection between falls and fractures of the hyoid bone and weakens

the connection between such fractures and strangulation. Pet. Ex. B at 1-3 (Doc. 1-

2 at 6-8); *see also* 5 Trial Tr. at 970:19-971:1.

A claim of innocence has not yet been held cognizable in federal habeas.

*Herrera v. Collins*, 506 U.S. 390, 400 (1993). Assuming the claim is cognizable,

Dr. Syme's letter and the attached abstract do not meet the appropriate standard,

because they do not prove, by clear and convincing evidence, that no reasonable

factfinder would have found Mr. Miller guilty. The letter and the abstract, in light

of all the evidence, do not suggest that all of Windham's injuries were caused by

one precipitous fall from the cliff, nor do they show that Mr. Miller did not cause

that fall by shoving Mr. Windham from the cliff.

The study may be relevant to procedural matters including timeliness. *Lee v.

Lampert*, 653 F.3d 929, 937 (9th Cir. 2012) (en banc) (recognizing that actual

innocence, shown on lower standard of proof, may support equitable tolling).[8] As

an independent claim for relief, however, it should be denied.

---

405(a), 608(a), 701; *State v. Geyman*, 729 P.2d 475, 479 (Mont. 2005).

   [8] The letter and abstract do not, however, transform into a "new" claim any claim of ineffective assistance that was adjudicated on the merits by the Montana Supreme Court, *see Dickens v. Ryan*, __ F.3d __, No. 08-99017, slip op. at 32, 34-35 (9th Cir. Jan. 23, 2014) (en banc); *compare Pinholster*, 131 S. Ct. at 1398.

## RECOMMENDATION

1. The claims described in Parts IV.A and IV.B(1)-(13) should be DENIED for lack of merit.

2. Mr. Miller's claim of innocence, Part IV.B.(14), should be DENIED as an independent claim for federal habeas relief.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Mr. Miller may object to this Findings and Recommendation within 14 days.[9] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Mr. Miller must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of his case without notice to him.

DATED this 20th day of February, 2014.

*/s/ Keith Strong*
Keith Strong
United States Magistrate Judge

---

[9] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.