IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| MICHAEL MAX MILLER, | Cause No. CV 13-13-GF-DWM-JTJ |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| LEROY KIRKEGARD; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

On February 6, 2013, Michael Max Miller filed a petition seeking a writ of

habeas corpus under 28 U.S.C. § 2254. Respondents ("the State") filed portions of

the state court's record on July 2, 2013. On February 20, 2014, this Court

appointed counsel to Mr. Miller and directed the State to file an Answer to some of

Miller's claims; (Doc. 24), however, the bulk of Miller's claims were

recommended for denial and ultimately were denied. (Docs. 25; 37). The State

filed an Answer on May 27, 2014. (Doc. 34).

The Court then ordered additional briefing on the issue of whether or not

*Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the Supreme Court decision creating a

narrow equitable exception to procedural default of ineffective assistance of

counsel claims, applies in Montana. On May 20, 2015, this Court determined that

*Martinez* does apply in Montana and ordered the parties to submit a proposed

1

schedule for disposition of the case. (Doc. 50). On November 20, 2015, the State filed a Motion for Summary Judgment, a brief in support, and a Statement of Undisputed Facts on Miller's three remaining claims. (Docs. 56, 57, and 58). On December 11, 2015, Mr. Miller filed his response to the Motion for Summary Judgment. (Doc. 61). The State filed its reply on December 31, 2016. (Doc. 64). This matter is ready for adjudication.

As a preliminary matter, it should be noted that on April 14, 2016, against the wishes of counsel, Mr. Miller submitted a pro se filing seeking to add one additional claim to his petition. (Doc. 65; 65-1). Miller contends that he was denied an indictment by a grand jury hearing, thus, the charging process was defective and the state court lacked jurisdiction. (Doc. 65-1 at 2-4). Miller has not requested or been granted the right to hybrid representation, thus the Court is under no obligation to review his pro se filings while he remains represented by counsel. *See, e.g., United States v. Reinke*, No. CR 15-31-BLG-SPW, Order at *1-2 (D. Mont. Jun. 30, 2015). Additionally, the Court is familiar with the argument Miller attempts to advance; it is wholly without merit. The Fifth Amendment Grand Jury Clause was not incorporated by the Fourteenth Amendment to apply to the states. *Branzbug v. Hayes*, 408 U.S. 665, 687-88 n. 25 (1972); *Alexander v. Louisiana*, 405 U.S. 625, 633 (1972); *Beck v. Washington*, 369 U.S. 541, 545 (1962). Mr. Miller's motion to amend should be DENIED.

## I.    Background

Mr. Miller's conviction arose from the disappearance of Lamar Windham,

Mr. Miller's friend and brother in law; Mr. Miller was ultimately charged with

deliberate homicide in violation of Mont. Code Ann. § 45-5-102(1)(a) (2005).

Mr. Miller was convicted following a jury trial in Great Falls, Montana. He is

currently serving a 100-year sentence at Montana State Prison and is not

eligible for parole for the first 25 years of his sentence. (Doc. 14-12 at 156).

The factual background has been set forth at length in previous documents filed

in this matter.  The facts pertinent to the remaining issues are outlined below.

### A. Trial Evidence and Testimony

At trial, Mr. Miller was represented by Carl Jensen and Melody Brown.  The

jury was selected and sworn on November 5, 2007. Testimony began on November

6.

#### i.    Events leading up to Windham's disappearance

On June 25, 2006, Mr. Windham and Mr. Miller attended the funeral of

Mr. Miller's wife which was held in Browning, Montana.  Upon return to Great

Falls, the two continued mourning together, which for them consisted of

drinking large quantities of alcohol, arguing intermittently, and driving around

in Mr. Windham's van.  Al Johnson was present for much of the post-funeral

activity.[1]  Eva Little Youngman, the sister-in-law to both Miller and Windham, testified that Miller and Windham got along pretty well, "[b]ut then they were always fighting each other over their wives."  (Doc. 14-8 at 386).  Windham's next door neighbor, Robert Williams, also knew Windham and Miller to argue frequently.  (Doc. 14-8 at 556).

Although the extended family was quite close with Windham, the relations were somewhat strained with Miller.  Eva acknowledged that she blamed Miller for her sister's death, because he drank with his wife.  (Doc. 14-8 at 410).  Eva also told investigators that the family did not like Miller and that he drank from the time he got up to the time he went to bed.  (Doc. 14-10 at 905-06).

At 1:30 in the afternoon, on June 26, 2006, Windham, Miller, and Johnson drove out to the Rainbow Scenic Overlook in Giant Springs Park.  Miller and Windham exited the vehicle together and approached a trail leading to a rocky outcrop overlooking the Missouri River.  Meanwhile Johnson, who was not feeling well, stayed back in the van.  Miller and Windham continued their arguing as they left the van, cursing at one another, with Windham apparently telling Miller he was going to "whoop [Windham's] ass."  (Doc. 14-8 at 494-

[1] At approximately 9:00 p.m. on June 25th, following the funeral, the three men purchased an 18-pack of beer and a bottle of schnapps and drove around in Windham's van.  (Doc. 14-8 at 481-484).  The next morning, Windham and Miller showed up together at Johnson's house and asked him to go riding with them again.  *Id*. at 488.  Prior to embarking on this trip, they picked up another 18-pack of beer, a bottle of schnapps, and a bottle of Black Velvet. *Id*. at 489.

4

96).  Approximately forty five minutes later, Miller returned to the van, sweaty and out of breath, without Windham.  *Id*. at 502.  Miller was unclear about Windham's exact whereabouts; telling Johnson first that Windham ran down the hill and then adding that he had gone down the hill with a girl.  *Id*. at 498-500.  According to Johnson, he convinced Miller to wait and look for Windham.  Johnson also testified that upon questioning where they had gone, Miller initially pointed in a different direction than Johnson had seen them travel; Johnson corrected him.  *Id*. at 501.  Miller then went down the hill and continued to look for Windham.

Janine Bender happened to be at the Rainbow Overlook at this same time.  She observed someone looking around, go to the van, come back out of the van, and then walk up to her car door.  Bender subsequently identified this man as Miller.  She immediately could tell he was intoxicated.  Miller told Bender that his friend went down below, that he came back up and couldn't find his friend.  He had apparently been looking for this friend and calling his name.  (Doc. 14-8 at 566).  He asked Bender for a ride, Bender declined and drove away.  *Id*. at 567.  Bender told Corporal Phillips that Miller acted concerned.  (Doc. 14-9 at 708).

After waiting for approximately an hour, Miller and Johnson did not locate Windham and ultimately left, with Miller apparently telling Johnson he would

return later to pick up Windham.  (Doc. 14-8 at 503).

## ii.    Events following Windham's disappearance

In the following days, Miller apparently told different people different things in relation to Windham's whereabouts.  Much trial testimony was presented relating to Miller's actions, some of which was seemingly conflicting and/or inconsistent.  For example, Johnson testified that on June 26, 2006, after their return from Giant Springs, Gary Dogtakinggun asked about Windham.  According to Johnson, upon questioning, Miller stated he did not want to talk about Windham and became angry and left.  *See*, (Doc. 14-8 at 506).  Conversely, Dogtakinggun testified that he did not talk to Miller about Windham's whereabouts until after Dogtakinggun himself was questioned by police, weeks after Windham's disappearance.  (Doc. 14-8 at 543).  Subsequently, Dogtakinggun testified that Miller told him Windham ran down the cliff.  (Doc. 14-8 at 543).

Miller's friend, Lindy Milliron, testified that Miller stated Windham had jumped over some bushes, and when Miller went partway down the trail to look for him, he didn't see Windham.  (Doc. 14-8 at 534-5).  Miller told Terry Matt that he and Windham had an argument at the dam and Windham ran down the trail. Miller explained he and Johnson waited for Windham, but Windham never showed back up.  (Doc. 14-8 at 549).  Windham's neighbor, Robert Williams, testified that Miller told him Windham went swimming below Giant Springs; apparently this

was somewhat suspicious as Williams did not believe Windham to be a swimmer. *Id*. at 554.

Eventually, after not hearing from Windham for several weeks and Windham missing planned events he normally attended, his family in Browning became concerned enough to travel to Great Falls in search of Windham. Eva Little Youngman testified that Miller told her initially over the phone that Windham had gone swimming at Giant Springs, but later stated he had left with some girls. *Id*. at 398. Ray Little Youngman, Windham's son, testified that Miller gave the family all kinds of excuses—including that Windham was swimming with someone and swam out too far never to be seen again and, alternatively, that he traveled out of state with a woman. *Id*. at 435-37. According to Ray Little Youngman, Miller gave these shifting stories to Windham's family members when the group headed out to Giant Springs to look for Windham, however, no one else present in the van apparently heard Little Youngman's questions or Miller's shifting responses. *See e.g.,* (Doc. 14-8 at 437-8; 452; 454; 456-7). According to Mary "Smoky" Griffin, Miller sat in the back of the van and was quiet during the drive to Giant Springs. (Doc. 14-8 at 466). The only statement that Miller made to her was, "I don't know why these guys are looking…Lamar's not here." *Id*. at 466.

There was testimony from Ray Little Youngman that when they were close

to where Windham's body was eventually found, Miller directed them in a different direction. *Id.* at 440-42. However, Smoky Griffin testified that Miller would not have even been in the position to yell to the others as he was away from the group and totally disengaged from helping search for Windham. (Doc. 14-8 at 473). Testimony was presented from other family members that Miller seemed alternatively nervous and bitter during the search.

After searching for some time, the group went to the police station. Immediately upon arrival, Miller left and did not speak with investigators. (Doc. 14-8 at 403, 424). Apparently, Miller explained he did not want to go into the police station because he knew he had an outstanding bench warrant. (Doc. 14-10 at 901). Johnson did stay and talk with investigators.

### iii.    Use of Windham's van

In the days following Windham's disappearance, Miller continued to use Windham's van. Johnson testified that Miller told him Windham had returned and allowed Miller to use his van. But Johnson also apparently told investigators that the day after Windham's disappearance, Miller told him Windham had not come back yet. (Doc. 14-10 at 900; 915). Windham's children testified that Windham never loaned out his van to others. (Doc. 14-8 at 442, 477). When Miller was questioned by officers, he denied using Windham's van at all.

### iv.    Discovery of Windham's Body

The body of Lamar Windham was discovered on July 18, 2006, in a badly decomposed state. The corpse was shirtless and barefoot. Attached to Windham's pants, on his back belt loop, was the key ring that Windham was known to use. The location of the keyring on his back belt loop seemed at odds with Windham's practice of carrying his keyring at his side. The State focused on this discrepancy to argue that Miller must have tampered with the key ring in order to obtain the key to the van. *See, e.g.* (Doc. 14-10 at 962-963).

 Johnson initially told Corporal Phillips that he believed the van key was left in the ignition when Windham and Miller left him, (doc. 14-9 at 741), but at trial Johnson testified he did not believe the key was left there. (Doc. 502-3).

In the days following the discovery of Windham's body, a Natural Ice beer can was also discovered on the trail above where the body was located. This was the type of beer that the three men had been drinking prior to Windham's disappearance. Forensic testing of the mixture of DNA obtained from the can excluded Windham as a possible contributor, but could not exclude Miller. The Montana State Crime Lab scientist testified the number of unrelated Caucasians in a random population that would be expected to have a DNA profile for inclusion in the mixture obtained from the can to be one in 6,460,000. (Doc. 14-9 at 654-66). The can was discovered in an area of the trail where Miller had denied being.

In an interview with investigators, which was played for the jury, Miller

acknowledged being with Windham at the dam yet denied that they had been arguing that day. He said Windham began running around and acting crazy. Miller could not keep up with Windham and lost him. He explained that he looked and yelled for Windham, but could not locate him. Miller stated he only went down the trail partway. He denied telling anyone that Windham had gone swimming and denied using Windham's van in the days following Windham's disappearance. *See generally*, Miller interview (Doc. 34-39). Miller did not testify at trial.

### v.    Expert testimony

The State Medical Examiner, Dr. Kemp, testified that the cause of Windham's death was blunt force injury to the head and neck, likely due to the fall, but he was unable to determine the manner of death. (Doc. 14-9 at 790-792). Much was made of the fracture to the hyoid bone—a fragile yet protected bone located within the neck and protected by the jaw—the State positing that Windham was strangled or his neck stomped on prior to death. Dr. Kemp testified that this fracture could have occurred in conjunction with the dislocation of Windham's neck. (Doc. 14-9 at 784-85). But he also noted such injury is commonly associated with strangulation or blunt force trauma. *Id*. at 786. Likewise, the defense expert, Dr. Symes, believed the fracture to the hyoid could have been caused by Windham falling from the cliff and the massive trauma and separation of

his cervical vertebrae that followed. (Doc. 14-10 at 861). Neither expert could conclusively determine the exact manner in which Windham died. That is, neither expert could say whether Windham's death occurred by homicide, suicide, or accident.

### vi. State's Closing Argument

In its rebuttal closing argument, the State began by responding to the defense counsel's argument and positing that Miller had just presented a "recipe for murder" and a "synopsis of how to commit murder and get away with it." (Doc. 14-10 at 957.) The prosecutor went on to argue that the location of the beer can, on the trail above where Windham's body was found, proved that Miller had lied by not telling the truth about how far down the trail he had traveled. *Id*. at 964.

### vii. Jury Verdict

After deliberating from approximately 6:45 p.m. to 10 p.m. on Thursday, November 8, the jury returned a guilty verdict at 3:30 p.m. on Friday, November 9, 2007. *Id.* at 973-97; Doc. 14-11 at 980-981.

### B. Direct Appeal

Mr. Miller appealed and was represented by new counsel, Lisa Korchinski, on appeal. He challenged the denial of his motion to dismiss based on speedy trial and the denial of his motion to compel production of Johnson's mental health records. He also challenged the jury instruction on witness credibility and the

prosecutors' remarks in closing argument regarding witness credibility and Mr. Miller's "silence" when Windham's family asked him where Windham was. The Montana Supreme Court rejected Mr. Miller's claims and affirmed his conviction. Order at 13 ¶ 33, *State v. Miller*, No. DA 08-0091, 2009 MT 314N (Mont. Sept. 23, 2009).[2]

### C. Post-Conviction

In January of 2011, Mr. Miller, acting pro se, filed a petition for post-conviction relief in the trial court. Case Register (Doc. 14-15) at 1 Entry 2. The petition was dismissed on August 12, 2011. Mr. Miller appealed. On June 19, 2012, the Montana Supreme Court affirmed the trial court's denial of post-conviction relief. *Miller v. State*, 280 P.3d 272, 282 ¶ 37 (Mont. 2012).

## II. Miller's Claims

Miller raises the following claims: (1) appellate counsel was ineffective for failing to challenge the sufficiency of the evidence; (2) trial counsel was ineffective for failing to object to a portion of the prosecution's closing argument; (3) trial counsel was ineffective for failing to call Dr. O'Donnell to testify regarding the possible effect on witness Al Johnson of combining Zyprexa and alcohol. This Court previously determined that all three claims were procedurally defaulted. (Doc. 52).

---

[2] This opinion is available at: http://supremecourtdocket.mt.gov.

### III. Analysis

#### A. Procedural Default/*Martinez v. Ryan*

A petitioner does not have a federal constitutional right to effective assistance of counsel during state post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 554 (1987). *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), established a limited exception to this general rule that only applies to Sixth Amendment ineffective assistance of counsel claims. *Martinez* held that inadequate assistance of post-conviction counsel or lack of counsel at initial collateral proceedings "may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. at 1315.

In *Nguyen v. Curry*, 736 F. 3d 1287, 1293 (9th Cir. 2013), the Ninth Circuit extended *Martinez*, holding that it can also apply to underlying claims of ineffective assistance on direct appeal. Therefore, if a petitioner asserts ineffective assistance of appellate counsel as an independent claim, *Martinez* may be used to excuse the default of that claim.

In *Trevino v. Thaler*, the Supreme Court described the four-prong *Martinez* analysis as requiring the following: (1) the claim of ineffective assistance of trial counsel must be a "substantial" claim; (2) the "cause" consists of there being "no

counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding where the ineffective assistance of trial counsel claim could be brought; and (4) state law requires that an ineffective assistance of counsel claim be raised in an initial-review collateral proceeding, or by "design and operation" such claims must be raised that way, rather than on direct appeal. 133 S. Ct. 1911, 1918, 1921 (2013).

In a prior order, this Court has addressed the third and fourth prongs and held that, in Montana, because defendants are generally precluded from raising ineffective assistance claims that require development of the record on direct appeal, by design, Montana law requires those claims to be raised in post-conviction proceedings. (Doc. 50 at 25-26). Accordingly, prongs 3 and 4 are both satisfied in the present case. Additionally, as set forth above, Miller did not have counsel during his post-conviction proceedings, so requirement 2 is also met. Thus, at issue in Miller's case is the first prong of the *Martinez* analysis. For the *Martinez* exception to apply, Miller must establish that the underlying claim of ineffective assistance is substantial. The United States Supreme Court has defined "substantial" as a claim that "has some merit." *Martinez*, 132 S. Ct. at 1318-19 (comparing the standard for certificates of appealability from *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). Stated inversely, a claim is "*in*substantial" if it "does not

have any merit or . . . is wholly without factual support." *Id.* at 1319.

Determining whether an IAC claim is substantial requires a federal court to examine the claim under *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) counsel's errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

Under the first *Strickland* prong, the reviewing court judges whether an attorney's performance was deficient against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the reasonableness of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense, or which witnesses and evidence to present, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Id.* at 690.

If a petitioner shows that counsel's performance was deficient, the next step in the *Strickland* inquiry is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is defined as a "probability sufficient to undermine confidence in the outcome." *Id.* As the *Strickland* Court instructed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695-96.

These standards from *Strickland* for determining deficient performance and prejudice, are, of course, the standards for an eventual review of the merits of the underlying IAC claim. The question whether an IAC claim is substantial under *Martinez* is not the same as a merits review; rather, it is more akin to a preliminary review of a *Strickland* claim for purposes of determining whether a certificate of appealability should issue. *See Martinez*, 132 S. Ct. at 1318-19. Thus, *Martinez* requires this Court to review, but not determine, whether trial or appellate counsel's acts or omissions resulted in deficient performance and in a reasonable probability of prejudice, and to determine only whether resolution of the merits of the ineffective claim would be debatable among jurists or reason and whether the issues are deserving enough to encourage further pursuit. *See Smith v. Ryan*, 823 F. 3d 270 (9th Cir. 2016) ("[T]o assess whether [the petitioner] has satisfied the first prong required to excuse his procedural default under *Dickens* [and *Martinez*], we conduct a preliminary assessment of his underlying claim.").

In order to determine whether a claim is substantial, *Martinez* requires the district court to *review* but not *determine* whether trial or appellate counsel's acts or omissions resulted in deficient performance and in a reasonable probability of prejudice. The district court must also *determine* only whether resolution of the merits of the IAC claim would be debatable among jurists of reason and whether

17

the issues are deserving enough to encourage further pursuit of them.

As explained in greater detail below, because a review of Miller's claims does not show trial counsel or appellate counsel performed deficiently or a reasonable probability of prejudice, the Court does not believe the issues are debatable or encourage further pursuit. Accordingly, Miller's claims are insubstantial under *Martinez* and its progeny. Therefore, they are procedurally defaulted without excuse. The State's motion for summary judgment should be granted. As an additional observation, even if the procedural bar were to be set aside, for the same reasons outlined below, Miller's claims also fail on the merits.

### i.     Claim 1- Ineffective Assistance of Appellate Counsel

The Sixth Amendment guarantees the right to effective representation on direct appeal. *See Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). In assessing a claim that counsel's representation did not meet the constitutional minimum, the court is to "indulge in a strong presumption that counsel's conduct f[ell] within the wide range of professional assistance." *Strickland*, 466 U.S. at 689. Effective legal assistance does not mean that appellate counsel must appeal every question of law and raise every non-frivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751-754 (1983). However, appellate counsel's performance must meet prevailing professional norms. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986).

Miller argues that appellate counsel rendered ineffective assistance by failing to raise a challenge to the sufficiency of the evidence on appeal. First, Miller must show that appellate counsel's performance was objectively unreasonable, which requires him to demonstrate that counsel acted unreasonably in failing to discover and brief a meritorious issue. *Moorman v. Ryan*, 628 F. 3d 1102, 1106 (9th Cir. 2010). Next, Miller has the burden of showing prejudice, that is, demonstrating a reasonable probability that, but for appellate counsel's failure to raise the sufficiency of the evidence claim, he would have prevailed in his appeal. *Id*. The Ninth Circuit has discussed the application of *Strickland* to ineffective assistance of appellate counsel claims:

> [t]hese two prongs partially overlap . . . In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason- because she declined to raise a weak issue.

*Miller v. Keeney*, 882 F. 2d 1428, 1434 (9th Cir. 1989); see also, *Bailey v. Newland*, 263 F. 3d 1022, 1028-29 (9th Cir. 2001). The question for analysis is whether the unraised issue, if raised, would have "led to a reasonable probability of reversal." *Id*. at 1434-35.

The circumstantial nature of the case against Miller was apparent from the start and at the forefront of the entire case. At the close of the State's case, Miller

moved for a directed verdict based upon the insufficiency of the evidence presented. In denying the motion, the trial court summarized the evidence that had been presented to the jury:

> This is a circumstantial case. There is no dispute on this evidence that a death occurred. There is no reasonable dispute on this evidence that Mr. Miller was at the scene of the death in close time and space, proximity to the death. He was the last person to be seen alive, or excuse me, that was to see Mr. Windham alive. He certainly had the opportunity to cause the death of Mr. Windham. There is evidence of an argument or conflict between Mr. Windham and Mr. Miller at the time immediately preceding Mr. Windham's death.
>
> There is evidence that Mr. Miller immediately after Mr. Windham's disappearance or fall from the cliff returned do the van, sweating, out of breath, nervous and was in a hurry to leave the scene.
>
> There is evidence that he did not report the disappearance or death of his brother-in-law to law enforcement authorities. He then subsequently, there's evidence that he subsequently gave different accounts of Mr. Windham's disappearance and his knowledge of Mr. Windham's disappearance, at least one of which appears to support an inference that it was patently unreasonable in that record, that is that he was swimming.
>
> Then there's the pre-trial custodial interrogation that took place at the Sheriff's office where there's evidence that the defendant's account to the law enforcement investigators indicates that he was not credible and honest with them and that that indicated that it could be inferred to indicate that he was concealing his knowledge in Lamar Windham's death. That's not the only conclusion to be drawn, but it's certainly one reasonable conclusion. Then we get to the forensic evidence, which is indeterminate alone, but due to the light most favorable with the States and when considered with other circumstantial evidence could reasonably be consistent with a criminal homicide.
>
> And then lastly, as an additional circumstantial basis for a criminal inference, we have the other post-disappearance or post-death suspicious and/or erratic conduct by Mr. Miller that could support different

conclusions, but one of the reasonable conclusions that it indicates a consciousness of guilt on the part of Mr. Miller.

(Doc. 14-10 at 821-823).

Here, it cannot be argued that appellate counsel, Korchinski, failed to discover the claim of insufficiency of the evidence. In fact, it was one of twelve different claims she initially identified upon review of Miller's case. (Doc. 57-1 at 14-15). She even began preparing a draft of a sufficiency claim for potential inclusion in the direct appeal but opted to abandon it upon further consideration of other claims. (*Id*. at 105-113). Korchinski explained that she found the argument to be weak, (doc. 63-1 at 25: 9; 27:7-9) and that there was recent precedent, *State v. Clausell*,[3] which established that circumstantial evidence alone was sufficient to sustain a conviction. (*Id*. at 25: 12-22). Ms. Korchinski further explained that, in her professional opinion, there were stronger arguments to make on appeal, rather than the sufficiency claim. (*Id*. at 39:8-11). While Miller may disagree with Korchinski's assessment of the strength of the insufficiency claim, he fails to demonstrate that Korchinski's performance was objectively unreasonable, thus, he has not made the requisite showing under the first prong of *Strickland*.

She also believed the standard to prevail on a sufficiency claim very difficult to meet and, given other Montana cases she had read, thought that it had little

---

[3] *State v. Clausell*, 305 Mont. 1, 2001 MT 62, 22 P. 3d 1111 (2001), does indeed reiterate the premise established in Montana state law that circumstantial evidence alone is sufficient to obtain a conviction. *Id*. at ¶ 31. In *Clausell*, the Court also observed that criminal intent may be inferred from the facts testified to by witnesses and circumstances developed by the evidence. *Id*. (citations omitted).

chance of success. *Id.* at 40: 9-22; 41:1. When asked if she had raised the issue of sufficiency of the evidence in Miller's appeal, if Miller would have prevailed, Korchinski responded, "Absolutely not, he would not have prevailed." *Id.* at 45:3-4.

In addition to *Clausell*, Korchinski's belief that the sufficiency claim would not have been successful for Miller is supported by a review of Montana Supreme Court deliberate homicide cases where the sufficiency of the evidence was challenged on appeal. *See, e.g., McGuinn v. State*, 177 Mont. 215, 581 P. 2d 417 (1978) (if believed by jury, substantial evidence existed to support homicide conviction); *State v. Armstrong*, 189 Mont. 407, 616 P. 2d 341 (1980) (evidence, although largely circumstantial, was sufficient to sustain defendant's conviction for deliberate homicide and robbery); *State v. Atlas*, 224 Mont. 92, 728 P. 2d 421 (1986) (although entirely circumstantial, evidence was sufficient to support defendant's convictions for deliberate homicide and arson); *State v. Lawrence*, 285 Mont. 140, 948 P. 2d 186 (1997) (sufficient evidence to support convictions for deliberate homicide, aggravated kidnapping, and robbery, despite lack of physical evidence an credibility issues with the state's witnesses); *State v. Enright*, 292 Mont. 204, 974 P. 2d 1118 (1998) (sufficient circumstantial evidence to establish the essential elements of arson and deliberate homicide beyond a reasonable doubt); *State v. McGarvey*, 329 Mont. 439, 124 P. 3d 1131 (2005) (evidence

including McGarvey's presence near the crime scene at the time of death and witness testimony that McGarvey was angry with one of the decedents sufficient to sustain deliberate homicide conviction); *State v. Smith*, 329 Mont 526, 127 P. 3d 353 (2005) (issue of "purposely and knowingly" in a deliberate homicide was for jury to decide when substantial conflicts existed between defendant's version of events and witness's version; sufficient evidence to deny motion for directed verdict and submit case to jury). Korchinski's belief as to the strength of the issue appears to be supported by Montana law. Accordingly, Miller has failed to establish prejudice under *Strickland*; he has not shown a reasonable probability that, but for Korchinski's failure to raise the sufficiency challenge, he would have prevailed on appeal.

Accordingly, the Court concludes that this claim is insubstantial. Miller has failed to show deficient performance or that, had Korchinski raised the sufficiency claim, there would have been a reasonable probability of reversal. Thus, the claim remains procedurally defaulted without excuse.

### ii. Claim 2—Ineffective Assistance of Trial Counsel: Failure to Object to State's Rebuttal Closing

Miller faults counsel for failing to object to two separate arguments made in the State's rebuttal closing: first that Miller was a liar, and, second, that Miller had crafted a "recipe for murder" implementation of which would allow him to get away with murder. During the rebuttal closing, the prosecution made the

following assertion relative to the first argument:

> Obviously we know we had the beer can, which again I was surprised that Mr. Jensen said there's nothing to the can, it's not important. The can puts him right there. This is the defendant who in his statements just came up a little ways. One time he said a quarter of the way, another one he said half a block, short distance, yet we find it all the way down here where we believe the confrontation took place.

> So what's the value of the can, Mr. Jensen? Your client lied. That's what it is. He didn't tell the truth.

(Doc. 14-10 at 964). The State is correct that on direct appeal the Montana Supreme Court considered whether or not this statement constituted prosecutorial misconduct. While that is not the specific question presented here—whether trial counsel was ineffective for failing to object to the statement—the analysis of whether this argument amounted to misconduct is instructive in resolving the ineffective assistance claim.

In rejecting the claim on appeal, the Montana Supreme Court found nothing unacceptable about the prosecution's statement that Miller lied about exactly how far down the trail he had traveled. *State v. Miller*, 2009 MT 314N, ¶ 30. Rather, according to the Court, the prosecutor properly drew an inference from the location of the beer can that Miller had been present further down the trail, possibly where a confrontation between Miller and Windham occurred. *Id*. This finding is consistent with federal law. *See, e.g., U.S. v. Molina,* 934 F.2d 1440, 1444 (9th Cir. 1991); *U.S. v. Atcheson,* 94 F.3d 1237, 1244 (9th Cir. 1996); *U.S. v. Garcia–*

*Guizar,* 160 F.3d 511, 520 (9th Cir. 1998); *U.S. v. Nash,* 115 F.3d 1431, 1439 (9th Cir. 1997). The prosecutor, therefore, did not engage in misconduct when he made a reasonable inference from the evidence that Miller's credibility was called into question and that he had lied to investigators. Thus, because the prosecutor's remarks did not constitute objectionable misconduct, trial counsel cannot be deemed to have been ineffective for failing to raise a meritless objection. *See, e.g., Juan H. v. Allen*, 408 F. 3d 1262, 1273 (9th Cir. 2005).

During this same rebuttal close, the prosecutor also argued that the defense had presented a "recipe for murder," a manner in which one could "commit murder and get away with it." (Doc. 14-10 at 9957). In his introductory remarks, the prosecutor then repeated the phrase "got away with murder" four times (doc. 14-10 at 958) and the phrase "recipe for murder" twice. *Id*. at 959. The prosecutor then moved into a summation of the evidence, the nature and value of circumstantial evidence, the state's theory of the case stemming from the evidence presented, and response to the arguments advanced by Mr. Miller for thirteen pages in the transcript. *See generally, Id*. at 959-972. The phrase "recipe for murder" was repeated one final time as the prosecutor concluded his rebuttal. (Doc. 14-10 at 973).

The State contends that this "recipe for murder" theme was made primarily in response to the defense's closing argument, (doc. 58 at 70-71), while Mr. Miller

contends it was objectionable argument intended to inflame the jury's passion. (Doc. 61 at 31). The Court finds that the "recipe for murder" theme, set out in the prosecution's introduction and reiterated a single time in the conclusion of the rebuttal remarks, constituted, in essence, an "invited response" to the closing argument advanced by defense counsel. *Darden v. Wainwright*, 477 U.S. 168, 182; *United States v. Young*, 470 U.S. 1, 12 (1985).

Even assuming *arguendo* that the rebuttal close was objectionable, generally, failure to object during a closing summation does not constitute deficient performance. "Absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *Cunningham v. Wong*, 704 F. 3d 1143, 1159 (9th Cir. 2013); see also, *U.S. v. Necoechea*, 986 F. 2d 1273, 1281 (9th Cir. 1993) (citing *Strickland*, 466 U.S. at 689).

Jensen explained that it was his practice generally not to object during closing argument. He explained that, in his experience, the objection was usually "shot down," or he was made to look like an obstructionist. (Doc. 57-2 at 53.) He also explained that there was a homicide case in Great Falls that went up on appeal where the prosecution made a similar argument to that made in Miller's case in closing, and the Montana Supreme Court denied the claim. *Id*. at 53-4. Additionally, Jensen generally was of the opinion that such an objection called

extra attention to the point the prosecution was attempting to make. *Id*. at 54, 55. In summation, while Jensen acknowledged that the prosecutor had a flamboyant way of speaking, he felt the closing was more offensive personally than legally. *Id*. at 55. Jensen also did not want to send a message to the jury, via his objection, that the state's rebuttal closing made him nervous or worried about his own defense. *Id*. at 55-56.

Likewise, Melody Brown generally concurred with Jensen's thoughts relative to why defense counsel generally refrains from objecting during closing argument. Essentially, Brown agreed that such an objection is likely to be overruled and failing to make one is a reasonable strategic maneuver aimed at not calling more attention to the problematic argument. (Doc. 57-3 at 55-57). Brown explained that, while she found the statements made by the prosecution objectionable, and while she herself would have objected had she been lead counsel (*id*. at 38-40), she did not find Jensen's performance to be deficient in any way. *Id*. at 42-58.

In reviewing the nature of the prosecution's rebuttal closing argument, and the rationale provided by counsel, Miller has not shown deficient performance by trial counsel. Because it has been determined, as set forth above, that the comments made by the prosecution in its rebuttal close were not improper, it is unlikely Miller could establish a reasonable probability of prejudice.

Additionally, the jury was instructed that their decision was to be made on the basis of the evidence alone and that the argument from counsel was not evidence. The Court is not convinced that either argument, made in the rebuttal closing, influenced the jury's ultimate decision or affected the fairness of the trial. Because a showing of substantiality has not been made, *Martinez* does not provide an avenue to set aside the default.

### iii. Claim 3—Ineffective Assistance of Trial Counsel: Failure to Call Witness

Finally, Miller contends that counsel was ineffective for failing to call Dr. O'Donnell in order to challenge Johnson's ability to accurately perceive what was happening prior to and following Windham's disappearance, due to his admitted consumption of alcohol while taking prescription Zyprexa. Although the trial court was prepared to admit the testimony of Dr. O'Donnell to explain the effects that could occur when an individual mixed the two contraindicated substances, the court also intended to limit the testimony to the general effects on an individual, rather than allowing Dr. O'Donnell to speak to the specific effect that the mixture had upon Johnson himself. (Doc.14-7 at 14-16).

Jensen and Brown discussed the possibility of obtaining a pharmacological expert to challenge Johnson's testimony with each other, as well as with other attorneys in their office. *See, e.g.*, Jensen Dep. (Doc. 57-2 at 26:17-18; 29:8-12; 34: 12-25; 39:1-7; 58:12-13). While the defense sought to undermine much of

what Johnson testified to, there was one specific statement Johnson initially gave that the defense believed to be crucial. Jensen recalled, "there was testimony by Johnson about the key in the vehicle that I think was helpful to our side . . . [b]ut as I recall, that was part of the reason we didn't call the expert to undermine him, was because there was certain parts of his testimony that we thought was good for our case and we wanted to use." (Doc. 57-2 at 56-57). As set forth above, Johnson initially told investigators that the key to the van was in the ignition the entire time Miller and Windham were away from the van. This fact, if believed by the jury, would serve to undermine the State's theory that, following an altercation, Miller removed the van ignition key from the keyring Windham kept at his side and inadvertently placed the clip on the back loop of Windham's pants, where it was ultimately located on July 18, 2006.

The jury heard testimony that Johnson was taking Zyprexa at the time of the incident (doc. 14-8 at 513-515) and also knew that Johnson was aware he was not supposed to mix the prescription with alcohol. (*Id*. at 530-32.) Moreover, as outlined in detail by this Court in a prior order, the jury knew of many inconsistencies and potentially inaccurate testimony provided by Johnson. *See*, (Doc. 25 at 9- 11). These included: the incorrect testimony he provided regarding what Windham was wearing at the time he disappeared, the length of time Windham and Miller were away from the van, whether or not the van key was left

in the ignition, whether or not he was present the night of Windham's disappearance to observe the interaction between Miller and Dogtakinggun, whether or not Windham had given Miller permission to use his van, whether or not Mr. Miller pointed him in the wrong direction when he searched for Windham at the Rainbow Overlook in July with Windham's family, and whether at the time of Windham's disappearance they were parked in the upper or lower parking lot of the Rainbow Overlook. *Id*.

Jensen and Brown consulted with Dr. O'Donnell and obtained an opinion from him (doc. 1-3 at 56-57), explored the risks and potential damage relative to the helpful testimony they could elicit from Johnson, and ultimately decided not to call Dr. O'Donnell. Brown stated that, had the decision been solely up to her, she would have called Dr. O'Donnell, but she also qualified that statement by claiming that, at the time of Miller's trial, Jensen was a more experienced trial attorney and. as lead counsel, he made the final strategic decisions. (Doc.57-3 at 34-5; 44). Brown also testified that she agreed the decision not to call Dr. O'Donnell was a tactical decision with which she agreed at the time of trial. (*Id*. at 43; 55.)

It follows, then, that the decision not to call O'Donnell "might be considered sound trial strategy." *Darden v. Wainwright*, 477 U.S. 168, 186. Strategic decisions, such as the choice of a defense or which witnesses or other evidence to present, "are virtually unchallengeable" if "made after thorough investigation of

law and facts relevant to plausible options." *Strickland,* 466 U.S. at 690.

Based upon review of this claim, it does not appear debatable that trial counsel performed deficiently or that, had Dr. O'Donnell been called to testify, the outcome would have been altered. Trial counsel's reasons for declining to call O'Donnell were sufficient, and the jury had ample testimony from which to question the reliability of Johnson as a witness and his ability to accurately report events. Accordingly, this claim is insubstantial and procedurally defaulted.

## IV.    Conclusion

Summary judgment is appropriate where the moving party demonstrates "that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). The motion should not be granted, however, if a reasonable trier of fact, viewing the evidence in the light most favorable to the non-moving party, could resolve a material issue in the non-moving party's favor. *See id*. at 248049; *Barlow v. Ground*, 943 F. 2d 1132, 1134-36 (9th Cir. 1991).

For the reasons set forth herein, petitioner has failed to establish that his claims are substantial under the framework provided by *Martinez* and its progeny. Accordingly, his claims are procedurally defaulted without excuse. Accordingly, the State is entitled to summary judgment as a matter of law on all of Miller's

claims.

## Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Where a claim is dismissed on procedural grounds, the court must also decide whether "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 648 (2012) (quoting *Slack*, 529 U.S. at 484).

As explained herein, the Court utilized the COA standard in determining that Miller failed to establish his three remaining claims were "substantial" for purposes of the *Martinez* analysis. Miller did not make this showing. Further, because Miller has not established a basis to set aside his procedural default, reasonable jurists would find no basis to encourage further proceedings.

Additionally, in applying the *Strickland* standard to his claims, it does not

appear that Miller established he was deprived of a constitutional right. There are no close questions, and there is no reason to encourage further proceedings. A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1.     The remaining claims in Mr. Miller's petition (Doc. 1) should be DISMISSED WITH PREJUDICE as procedurally defaulted.

2.     The State's Motion for Summary Judgment (Doc. 56) should be GRANTED.

3.     Mr. Miller's Motion to Amend (Doc. 65-1) should be DENIED.

4.     The Clerk of Court should be directed to enter, by separate document, a judgment of dismissal.

5. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Mr. Miller may object to this Findings and Recommendation within 14 days.[4] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

---

[4]  As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.

Mr. Miller must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of his case without notice to him.

DATED this 12th day of October 2016.

/s/ John Johnston
John Johnston
United States Magistrate Judge